2010 UT App 219

**Richard PRATT, Petitioner and Appellee,**

v.

**Charles PUGH, Respondent and Appellant.**

No. 20090067–CA.

Court of Appeals of Utah.

Aug. 12, 2010.

James C. Haskins and Graham J. Haskins, Salt Lake City, for Appellant.

Ronald D. Wilkinson, Orem, for Appellee.

Before Judges DAVIS, McHUGH, and VOROS.

## OPINION

VOROS, Judge:

¶ 1 Respondent Charles Pugh appeals the trial court's entry of summary judgment in favor of Petitioner Richard Pratt. The trial court ruled that the liens created by Pugh's two trust deeds against Pratt's property were wrongful under the Wrongful Lien Act (the Act) and released them. *See* Utah Code Ann. §§ 38–9–1 to –7 (2005 & Supp.2009). We reverse.

## BACKGROUND

¶ 2 The wrongful lien question before us is nested in a sprawling and hotly disputed transaction only hinted at by the briefs on appeal. Real Estate Investment Specialists, Inc. (REISI), of which Pugh is a shareholder, and Chris Pugh, Pugh's son, agreed to finance a business venture undertaken by Sovren Group, LLC (Sovren) involving "high grade concentrate ore." The investors hoped to provide financing of $4 million and reap "investment returns" of approximately $80 million paid over a period of twenty years. In connection with this transaction, on April 7, 2006, Jan W. Carlson, Bruce H. Coles, and Russell L. Robinson signed on behalf of Sovren a $4 million Promissory Note/Security Agreement payable to REISI. REISI was to disburse $4 million in three phases; Phase I was a disbursement of $500,000 to be paid after the delivery of unspecified trust deeds and security agreements. Sovren agreed to repay, over ten years, the principal of $4 million together with "return on investment" of $42 million. On April 11, 2006, Carlson, Coles, and Robinson signed on behalf of Sovren what purports to be a $2 million Promissory Note/Security Agreement payable to Pugh and Arnold E. Gilliam. The note in fact provides that Pugh and Gilliam were to disburse $4 million over three phases; Phase I was again a disbursement of $500,000 to be paid after the delivery of trust deeds against Pratt's two properties pursuant to a "Guar-

anty Agreement/Security Agreement." Sovren agreed to repay, again over ten years, the principal of $4 million together with "return on investment" of $22 million.

¶ 3 According to Pratt's affidavit, he allowed two properties to be encumbered by Pugh as "collateral for the investment." In a "Security Agreement" dated April 7, 2006, Pratt granted to Pugh a security interest in two properties. Pratt also signed a Guaranty Agreement/Security Agreement dated April 10, 2006, in which he guaranteed "Phase I collateral performance of the Sov[re]n/Charles D. Pugh Promissory Note/Security Agreement." Sovren executed two trust deeds encumbering Pratt's two properties (the trust deeds). Although Sovren was not the record title owner of the properties, Pratt has acknowledged that he signed a document authorizing Sovren to sign the trust deeds.[1] He may have been referring to one or both of the security agreements or to some other document. In any event, the parties do not dispute Sovren's authority to execute the trust deeds encumbering Pratt's properties. On April 11, 2006, Guardian Title recorded the two trust deeds and disbursed $500,000 to Sovren from Pugh's escrow account.

¶ 4 On or about April 21, 2006, REISI, Gilliam, and Pugh sent a letter to Sovren, Carlson, Coles, and Robinson repudiating the $2 million Note dated April 11, 2006, but affirming the $4 million Note dated April 7, 2006.[2] Within a few months, REISI filed suit against Pratt, Sovren, Carlson, Coles, Robinson, Guardian Title, and others seeking damages for breach of contract and a host of other causes of action, including defamation, tortious interference with contract, and intentional interference with economic relations. Sovren, Carlson, Coles, and Robinson filed a third party complaint against Pugh, Gilliam, and one other person. In his answer to this third party complaint, Pugh alleged that "the [trust] deeds were supposed to be

---

1. Pratt stated in a deposition, "I had to have signed an agreement agreeing to ... transferring, so they could encumber the property.... So, [Sovren] signed the Deed of Trust. I had to have signed something in that pile of papers that allowed them to sign the deeds."

2. Precisely when this letter was sent is unclear. The letter is dated April 11, 2006. It is not signed by the purported senders, but it is signed by a notary public. Her signature is dated April 21, 2006. In addition, the document appears to be the second page of a fax sent April 21, 2006.

additional collateral for the April 7, 2006 agreements ... and only became collateral for the April 11, 2006 agreement through fraud and extortion to take REISI's $500,000, and to obtain better terms." The answer also stated that Pugh "repudiated the April 11, 2006 agreement due to Pratt's and the other Defendants' fraud, lies, extortion, and coercion."

¶ 5 On September 26, 2006, counsel for Pratt sent a letter to Pugh demanding a release of the "wrongful lien" and threatening suit in the event the liens created by the trust deeds were not released. Pugh responded with a letter re-affirming the trust deeds on the ground that they secured contracts that were "under a cloud of dispute and legal proceedings." Pugh's letter further stated that the trust deeds would not be released until the debt they secured was paid according to the terms of "the note" or "when the legal proceedings are culminated." Pratt responded with the instant petition under the Act.

¶ 6 In a motion for summary judgment, Pratt argued that the liens created by the trust deeds were wrongful because, based on the positions Pugh had taken in the main case, either (a) there was no meeting of the minds and, thus, no valid contract was ever formed, or (b) Pugh had repudiated the agreement. Pratt did not propose to return or to have Sovren return the proceeds of the $500,000 loan secured by the trust deeds. Pugh responded that, having initially authorized the trust deeds, Pratt, "because of his own fraud in changing the terms of the agreements without disclosing the same to Mr. Pugh, is trying [to] capitalize on his fraud and remove the liens." The trial court entered summary judgment in favor of Pratt and ordered the liens released. It reasoned that the liens were wrongful "since it [was] undisputed that the contract between the parties failed at its inception." This ruling effectively converted a secured half-million-dollar loan into an unsecured half-million-dollar loan. The court also awarded Pratt statutory damages and attorney fees.

## ISSUE AND STANDARD OF REVIEW

¶ 7 On appeal, Pugh contends that the trial court erred by ruling on summary judgment that the liens created by the trust deeds against Pratt's property were wrongful under the Act. "Summary judgment is appropriate only where (1) 'there is no genuine issue as to any material fact' and (2) 'the moving party is entitled to a judgment as a matter of law.' " *Poteet v. White*, 2006 UT 63, ¶ 7, 147 P.3d 439 (quoting Utah R. Civ. P. 56(c)). "Therefore, [w]e review the [trial] court's decision to grant summary judgment for correctness, granting no deference to the [trial] court." *Eldridge v. Farnsworth*, 2007 UT App 243, ¶ 18, 166 P.3d 639 (internal quotation marks omitted). Whether a lien is wrongful as defined in Utah Code section 38–9–1 is a "question of law which we review for correctness, giving no deference to the trial court's legal conclusions." *See id.* ¶ 21 (internal quotation marks omitted); *see also Russell v. Thomas*, 2000 UT App 82, ¶ 8, 999 P.2d 1244 (stating that whether a lien is wrongful under the Act requires statutory interpretation and, therefore, is reviewed for correctness).

## ANALYSIS

¶ 8 Pursuant to the Act, "[a]ny record interest holder of real property against which a wrongful lien ... has been recorded may petition the district court in the county in which the document was recorded for summary relief to nullify the lien." Utah Code Ann. § 38–9–7(1) (2005); *see also Gardiner v. York*, 2010 UT App 108, ¶ 14, 233 P.3d 500. The statutory language does not make clear whether the legislature intended the petition "to act as a motion for an expedited proceeding addressing one issue within the context of a larger civil action, like a motion for partial summary judgment on the wrongful lien issue, or as a separate and independent action designed to resolve the wrongful lien claim." *Anderson v. Wilshire Invs., LLC*, 2005 UT 59, ¶ 14, 123 P.3d 393. Here, Pratt elected to file a petition separate from the main case involving this investment transaction.

¶ 9 "The summary proceeding contemplated by this statute is limited in a number of respects." *Id.* ¶ 10. For example, the summary proceeding "is only to determine

whether or not a document is a wrongful lien." Utah Code Ann. § 38–9–7(4). The court "shall not determine any other property or legal rights of the parties nor restrict other legal remedies of any party." *Id.*

¶ 10 The Act "defines 'wrongful lien' narrowly." *Anderson,* 2005 UT 59, ¶ 10, 123 P.3d 393.

> "Wrongful lien" means any document that purports to create a lien, notice of interest, or encumbrance on an owner's interest in certain real property and at the time it is recorded or filed is not:
>
> (a) expressly authorized by this chapter or another state or federal statute;
>
> (b) authorized by or contained in an order or judgment of a court of competent jurisdiction in the state; or
>
> (c) signed by or authorized pursuant to a document signed by the owner of the real property.

Utah Code Ann. § 38–9–1(6) (Supp.2009). This section is explicit that the wrongfulness of a lien must be determined as of "the time it is recorded or filed," *id.* Indeed, we have held that this section requires a court to evaluate the validity of a lien "based on the facts known at the time it was recorded, not at a later point in time after evaluating the merits." *Eldridge,* 2007 UT App 243, ¶ 50, 166 P.3d 639.

¶ 11 Unlike most wrongful lien appeals, the case at bar involves subsection (c).[3] Thus, the question before us would seem to be whether, at the time they were recorded, the trust deeds were "signed by or authorized pursuant to a document signed by" Pratt.

*See* Utah Code Ann. § 38–9–1(6)(c). But the trial court did not rule, and Pratt does not contend, that at the time they were recorded the trust deeds were not authorized pursuant to a document signed by Pratt. This would seem to conclude the matter in Pugh's favor.

¶ 12 However, Pratt contends that "the liens against his property were based on an invalid contract and were thus invalid as well." [4] Even if the trust deeds "were technically 'signed by or authorized pursuant to a document signed by the owner of the real property,'" Pratt argues, "it follows logically that the lien would lose such authorization if the underlying agreement authorizing the lien were *later* adjudged to be void." (Emphasis added.) Pugh, he asserts, although "arguably 'authorized' to place the liens, should have immediately removed the liens when he realized there was no valid contractor at the very least the court's *later* finding that such liens were invalid should be upheld." (Emphasis added.) In sum, Pratt argues that, although valid when filed, the trust deeds became invalid as a matter of law when a related agreement or promissory note was adjudged void. Likewise, although the trial court concluded that "the contract between the parties failed at its inception," this conclusion was based on Pugh's subsequent repudiation of the related contract or contracts.

¶ 13 This analysis employs the very retrospective evaluation of the trust deeds prohibited by controlling law. As noted above, the wrongfulness of a lien must be determined as of "the time it is recorded or filed," Utah Code section 38–9–1(6), and

---

**3.** Appeals under the Act typically involve subsection (a) and address whether a lien claimant was authorized by state statute to file a notice of interest or lis pendens. *See, e.g., Centennial Inv. Co. v. Nuttall,* 2007 UT App 321, ¶¶ 15–16, 171 P.3d 458 (determining whether the notice of interest at issue was authorized by statute under subsection (a)); *Eldridge v. Farnsworth,* 2007 UT App 243, ¶ 48, 166 P.3d 639 (addressing only whether the lis pendens at issue was authorized by statute and thus outside the definition of "wrongful lien" under subsection (a)). Here, however, the parties agree that neither subsection (a) nor subsection (b) applies.

**4.** Pratt did not seek rescission of the purportedly invalid contract or contracts at issue here. That

would have required him or Sovren to relinquish the $500,000 received from Pugh. "It is inequitable that [a party] should, while retaining the benefits arising from one part of the contract, be allowed to rescind the other part." *Kelly v. Kershaw,* 5 Utah 295, 14 P. 804, 806 (1887). "The general rule is that one must rescind all of his contract and may not retain rights under it which he deems desirable to have and repudiate the remainder of its provisions." *Simmons v. California Inst. of Tech.,* 34 Cal.2d 264, 209 P.2d 581, 587 (1949) (citations omitted). "The theory underlying such a rule is that retention of only the benefits of the transaction amounts to unjust enrichment and binds the parties to a contract which they did not contemplate." *Id.*

"based on the facts known at the time it was recorded, not at a later point in time after evaluating the merits," *Eldridge v. Farnsworth*, 2007 UT App 243, ¶ 50, 166 P.3d 639. The conclusion that Pugh repudiated one or more of the obligations secured by the trust deeds is based on a letter sent ten days and a pleading filed twelve months after the trust deeds were recorded, not "on the facts known at the time [the trust deeds were] recorded," *id.*[5]

¶ 14 The trial court's ruling also exceeded the scope of the Act. In a summary proceeding under the Act, the trial court may determine whether the lien at issue` is wrongful but "shall not determine any other property or legal rights of the parties nor restrict other legal remedies of any party." Utah Code Ann. § 38–9–7(4) (2005). As noted above, the trial court here ruled that the liens created by the trust deeds were wrongful "since it [was] undisputed that the contract between the parties failed at its inception." The "contract" referred to was not the trust deeds at issue in this case; Pugh has never repudiated them. Rather, the "contract" referred to by the court was apparently one of the Guaranty Agreements signed by Pratt, the $4 million Promissory Note/Security Agreement signed by Sovren and payable to REISI, or the $2 million Promissory Note/Security Agreement signed by Sovren and payable to Pugh and Arnold E. Gilliam. The finding that Pugh repudiated "the contract" rests on Pugh's answer to a third party complaint filed by Sovren, Carlson, Coles, and Robinson against Pugh and two others in a separate action. The Amended Complaint in that action was filed by REISI and Pugh's son, Chris Pugh, against Sovren, Pratt, Carlson, Coles, Robinson, Guardian Title, and two others. The Amended Complaint alleges eight causes of action, including breach of contract, defamation, tortious interference with contract, intentional interference with prospective economic relations, conspiracy to defraud, intentional in-

fliction of emotional distress, unjust enrichment, and improper dealing by a fiduciary. These claims all arise from the parties' acts with respect to "the contract" adjudicated in the summary proceeding in this case. Thus, the trial court adjudicated not only the trust deeds at issue in the summary wrongful lien proceeding but also one or more of the agreements or promissory notes central to a companion case involving numerous other claims and parties. This far exceeds the "limited" scope of the summary proceeding contemplated by section 38–9–7(4). *See generally Anderson v. Wilshire Inv., LLC*, 2005 UT 59, ¶ 14, 123 P.3d 393. Accordingly, we conclude that the trial court erred in ruling as a matter of law that the liens created by the trust deeds were wrongful.

¶ 15 Pratt contends that *Centennial Inv. Co. v. Nuttall*, 2007 UT App 321, 171 P.3d 458, requires affirmance. *Centennial* involved a piece of real property owned jointly by a divorced couple. *See id.* ¶ 2. The divorce decree provided that neither party could sell the property without the other's consent. *See id.* However, the husband alone signed a real estate purchase contract (REPC) agreeing to sell the property to Centennial Investment Company. *See id.* ¶ 3. Shortly thereafter, the husband and wife both signed an agreement to sell the property to a different buyer. *See id.* ¶ 4. Centennial sued to enforce its right to the property and filed a notice of interest against the property. *See id.* ¶ 5. On the wife's motion, the trial court nullified the notice of interest under the Act. *See id.* ¶ 6.

¶ 16 On appeal, Centennial contended that the notice of interest was authorized by statute, thereby exempting it from the definition of wrongful lien under section 38–9–1(6)(a). *See id.* ¶ 14; *see also* Utah Code Ann. § 38–9–1(6)(a) (Supp.2009) (excluding from the definition of "wrongful lien" any document creating a lien that is "expressly authorized by this chapter or another state or federal statute"). This court assumed for purposes

---

**5.** The letter from Pugh et al. to Sovren et al. dated April 11, 2006, and apparently sent April 21, 2006, might in part support an inference that Pugh repudiated one of the two promissory notes secured by the trust deeds on the date they were recorded. However, this same letter expressly reaffirms the other promissory note secured by the trust deeds. Accordingly, it cannot establish as a matter of law that, at the time the trust deeds were recorded, Pugh had already repudiated "the contract" they secured.

of argument that the relevant statute was Utah Code section 57-9-4(1) of the Marketable Record Title Act, Utah Code Ann. §§ 57-9-1 to -10 (2000). That statute provides that any person claiming an interest in property may file a notice to preserve that interest. *See Centennial*, 2007 UT App 321, ¶ 15, 171 P.3d 458 (citing Utah Code Ann. § 57-9-4(1)). We affirmed the trial court's ruling on the ground that without the wife's signature the REPC could not convey an interest in the entire property to Centennial and, therefore, "Centennial's lien recorded against the entire parcel [was] wrongful." *Id.* ¶ 16. Accordingly, the Marketable Title Act did not authorize the notice of interest against the entire property. *See id.*

¶ 17 *Centennial* does not aid Pratt. To begin with, *Centennial* applied a different subsection of section 38-9-1(6) from the one at issue here—subsection (a) rather than subsection (c). Under subsection (c), the dispositive question is whether the challenged lien was authorized by the property owner, not whether it was authorized by statute. *See* Utah Code Ann. § 38-9-1(6)(c) (Supp.2009). Nevertheless, the cases are analogous in at least one important respect. In *Centennial*, the validity of the notice of interest depended on whether the REPC had been signed by the property owners. Because the REPC was not signed by both property owners, the notice of interest was wrongful under the Act. Here, the validity of the liens depends on whether the trust deeds were "signed by or authorized pursuant to a document signed by the owner" of the property, *see id.* Because the parties agree that the trust deeds were authorized by a document signed by the property owner, the liens created by the trust deeds are not wrongful under the Act. Thus, to the extent *Centennial* applies, it supports Pugh, not Pratt.

¶ 18 Nor does *Centennial* stand for the proposition that later events may cast doubt on an earlier lien. In *Centennial*, we were clear that the wrongfulness of a lien is determined " 'at the time it is recorded.' " 2007 UT App 321, ¶ 14, 171 P.3d 458 (quoting Utah

Code Ann. § 38-9-1(6)(a) (2005)). We did not hold that the REPC was authorized at the time the notice of interest was filed but invalidated by later events. *See id.* ¶¶ 13-16. The REPC was never authorized, because one of the two property owners never signed it. *See id.* ¶ 12.

¶ 19 In addition to nullifying the trust deeds, the trial court awarded Pratt statutory damages under Utah Code section 38-9-4. *See* Utah Code Ann. § 38-9-4 (2005). Section 38-9-4(2) provides that if a person "refuses to release or correct [a] wrongful lien within 20 days from the date of written request from a record interest holder of the real property . . . the person is liable to that record interest holder for $1,000 . . . and for reasonable attorney fees and costs." *Id.* § 38-9-4(2). In addition, section 38-9-4(3) provides that "[a] person is liable to the record owner of real property for $3,000 . . . and for reasonable attorney fees and costs, who records . . . a wrongful lien . . . against the real property, knowing or having reason to know that the document . . . is a wrongful lien." *Id.* § 38-9-4(3)(a).[6] Pursuant to those statutes, the trial court awarded Pratt $4,000 in statutory damages. It also awarded Pratt the full amount of his attorney fees set forth in his counsel's affidavit of attorney fees. Because we conclude the trial court erred in determining that the trust deeds were wrongful, we vacate the award of statutory damages. *See Foothill Park, LC v. Judston, Inc.*, 2008 UT App 113, ¶ 20, 182 P.3d 924 (reversing the trial court's conclusion that the lien at issue was wrongful under the Act and, therefore, also reversing the award of statutory damages and attorney fees under section 38-9-4 of the Act).

■ ¶ 20 Our decision is limited in scope. Although we hold that the trial court improperly invalidated the liens in a summary proceeding under the Wrongful Lien Act, we do not adjudicate their ultimate validity.

Although a lien may be deemed valid when the analysis is focused exclusively on the three wrongful lien factors contained in the Wrongful Lien Act, and therefore not sub-

---

6. The Act has since been amended, and the amount of statutory damages has increased. *See* Utah Code Ann. § 38-9-4 (Supp.2009) (increasing the amount of statutory damages from $1,000 and $3,000, to $3,000 and $10,000, respectively). This amendment does not change our analysis.

ject to nullification in a summary proceeding, a petitioner may nevertheless prevail after a full hearing by demonstrating some other basis for invalidating the lien.

*Anderson v. Wilshire Invs., LLC,* 2005 UT 59, ¶ 35, 123 P.3d 393. We thus express no opinion as to whether, after a "full hearing," the liens may yet be invalidated on grounds unavailable to the trial court in this summary proceeding.

## CONCLUSION

¶ 21 The trial court erred in nullifying the liens under the Wrongful Lien Act. We reverse the trial court's determination that the liens were wrongful and vacate its award of statutory damages and attorney fees.

¶ 22 WE CONCUR: JAMES Z. DAVIS, Presiding Judge, and CAROLYN B. McHUGH, Associate Presiding Judge.